1

2

3

4

5

6

7

8
# UNITED STATES DISTRICT COURT

9
### EASTERN DISTRICT OF CALIFORNIA

10

11
JAMES E. WHITE,                         Case No.  1:12-cv-00917-BAM (PC)

12
                    Plaintiff,          ORDER GRANTING DEFENDANT
                                        COUNTY OF MERCED'S MOTION FOR
13
          v.                            SUMMARY JUDGMENT

14
COUNTY OF MERCED,                       (ECF No. 72)

15
                    Defendant.

16

17
**I.      Introduction**

18
          Plaintiff James E. White ("Plaintiff") is proceeding *in forma pauperis* and represented by

19
counsel in this civil rights action pursuant to 42 U.S.C. § 1983.  This action currently proceeds on

20
Plaintiff's second amended complaint against Defendant County of Merced, for denial of

21
visitation with his minor children while he was housed at Merced County Jail, in violation of his

22
Fourteenth Amendment rights.  All parties have consented to Magistrate Judge jurisdiction.  (ECF

23
Nos. 6, 56.)

24
          On January 16, 2018, Defendant filed a motion for summary judgment on the ground that

25
there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter

26
of law, together with a statement of undisputed material facts.  (ECF Nos. 72, 73.)  Plaintiff filed

27
an opposition to the motion for summary judgment and a statement of undisputed facts on

28
February 6, 2018.  (ECF Nos. 76, 77.)  Defendant filed a reply on February 13, 2018.  (ECF No.

79.)  The motion is deemed submitted.  Local Rule 230(l).

**II.     Legal Standard**

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A material fact is one that may affect the outcome of the case under the applicable law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."  Id.

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof.  See Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  Id.  (citing Celotex, 477 U.S. at 323).  In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case."  Id.

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." F.T.C. v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted).  "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard.  Id. at 929; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (citation omitted).  "Where the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." <u>Soremekun</u>, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." <u>Anderson</u>, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. The Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**III.    Discussion**

    **A.    Evidentiary Objections**

Plaintiff raises various objections to much of Defendant's Statement of Undisputed Material Facts. In addition, Defendant argues that Plaintiff has failed to provide supporting evidence for many of the facts he alleges are disputed. As noted above, not every objection will be addressed by the Court individually, as doing so is neither necessary nor is that the practice of this Court in the summary judgment context. For the sake of clarity and to the extent it is appropriate, certain individual objections have been addressed by the Court below. Other objections are better dealt with here, in general terms.

The hearsay objections are overruled. Declarations which contain hearsay are admissible for summary judgment purposes if they can be presented in admissible form at trial. <u>Fonseca v. Sysco Food Servs. of Ariz., Inc.</u>, 374 F.3d 840, 846 (9th Cir. 2004). Furthermore, "[i]f the significance of an out-of-court statement lies in the fact that the statement was made and not in

3

the truth of the matter asserted, then the statement is not hearsay." <u>Calmat Co. v. U.S. Dep't of Labor</u>, 364 F.3d 1117, 1124 (9th Cir. 2004). At this stage, the Court did not find the hearsay objections raised by Plaintiff to be preclusive of the evidence submitted, or that the statements objected to were, in fact, hearsay.

Plaintiff's numerous objections based on lack of foundation, the presentation of expert testimony, or as being conclusory, are also overruled. Lieutenant Ristine and Sheriff Pazin adequately set forth the foundation for their knowledge and expertise in their declarations, and the Court finds these objections baseless. The Court further notes that Plaintiff has not provided any contrary evidence to demonstrate a true dispute as to their expertise in these areas.

As such, Defendant's argument that Plaintiff has failed to provide supporting evidence for many of the facts which he claims are in dispute, is well taken. Federal Rule of Civil Procedure 56(c)(1) specifically requires that a party asserting that is genuinely disputed must support the assertion by "citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Similarly, pursuant to Local Rule 260(b), a party opposing a motion for summary judgment is required to deny those facts that are disputed, "including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial." To the extent Plaintiff has identified that a fact is in dispute but fails to provide supporting evidence or otherwise demonstrate that the evidence relied upon by Defendant is inadmissible, such fact will be accepted as undisputed.

Finally, given the Court's duty to determine whether there exists a genuine dispute as to any material fact, objections to evidence as irrelevant are both unnecessary and unhelpful. <u>See e.g.</u>, <u>Carden v. Chenega Sec. & Protections Servs., LLC</u>, No. CIV 2:09-1799 WBS CMK, 2011 WL 1807384, at *3 (E.D. Cal. May 10, 2011); <u>Arias v. McHugh</u>, No. CIV 2:09-690 WBS GGH, 2010 WL 2511175, at *6 (E.D. Cal. Jun. 17, 2010); <u>Tracchia v. Tilton</u>, No. CIV S-062919 GEB KJM P, 2009 WL 3055222, at *3 (E.D. Cal. Sept. 21, 2009); <u>Burch v. Regents of Univ. of Cal.</u>, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). On the other hand, the Court also notes that the

parties' inclusion of immaterial and repetitive facts is similarly unnecessary and unhelpful.

## B. Undisputed Material Facts ("UMF")[1]

1. Merced County has had a significant gang problem for many years. Nortenos and Surenos were, and are, rival gangs who often engage in acts of violence, including murder, upon each other. Gang members visited other gang members in jail. (ECF No. 72-2, Ristine Decl. at 2:6–9.)

2. These acts of violence were perpetrated not only outside of jail, but also within the jail compounds. (Ristine Decl. at 2:9–10.)

3. These gangs also perpetrated acts of violence, including murder, upon their own gang members in order to ensure compliance with gang directives. (Ristine Decl. at 10–12.)

4. Significant numbers of inmates had mental issues and/or took psychotropic medications. (Ristine Decl. at 2:16–17; ECF No. 72-3, Pazin Decl. at 2:9–10.)

5. During the time Plaintiff was incarcerated at the jail, correctional staff consisted of correctional officers, correctional sergeants, and commanders. Each category had different authority. (Ristine Decl. at 4:17–19.)

6. During the time Plaintiff was incarcerated at the jail, staffing was short due to recruiting and severe budget issues. Accordingly, it was more difficult to monitor visitation activities with the presence of young children, who may be more difficult to control by virtue of their ages. They are also harder to protect in stressful or violent situations. (Ristine Decl. at 4:20–24.)

7. Persons waiting to visit an inmate at the main jail were required to wait in the lobby of the sheriff's building. (Ristine Decl. at 2:18–19 & Photo 1.)

8. The two-story building has a front lobby with a reception window. Anyone coming to the department, for any purpose, would go to this reception area and show valid ID and

---

[1] See Defendant's Separate Statement of Undisputed Material Facts, (ECF No. 73); Plaintiff's Objections and Response to Defendant's Statement of Undisputed Material Facts, (ECF No. 77); Plaintiff's Separate Statement of Undisputed Material Facts in Opposition to Defendant's Motion for Summary Judgment, (ECF No. 77-1). As Defendants did not object to or dispute any part of Plaintiff's Separate Statement of Undisputed Material Facts, those facts are accepted as undisputed where supported by admissible evidence. Unless otherwise indicated, disputed, duplicative, and immaterial facts are omitted from this statement and relevant objections are overruled.

sign in.  The person at the window would check the visitor's status to ensure he or she was on the inmate's visitor list.  The entrance to the lobby from the outside is all glass.  (Ristine Decl. at 3:19–24 & Photos 2, 3.)

9.     A secure hallway to the left leads to the administrative offices, including the offices of the Sheriff and Undersheriff.  Immediately to the left of the reception glass is the secured door to a transition hallway measuring about eight feet, with another secured door on the other side.  (Ristine Decl. at 3:25–28 & Photo 4.)

10.     The jail cells and visitation rooms are on the other side of the transitional hallway. (Ristine Decl. at 4:1–2 & Photo 5.)

11.     The other side of the transition hallway is composed of the jail.  Thus, inmates may be in-processed or in special cells such as for drunks, those with emotional problems, or those needing segregation.  (Ristine Decl. at 4:2–4.)

12.     To the left, upon passing the second security door, are the main cell blocks.  The blocks consist of hallways with jail cells on one side.  (Ristine Decl. at 4:4–6 & Photo 6.)

13.     The visiting rooms are in the hallway perpendicular to the cell blocks.  The visiting rooms are narrow with pedestals on which the visitors could sit.  (Ristine Decl. at 4:7–9 & Photos 7, 8.)

14.     Visitation at the Main Jail was generally non-contact visitation.  (Sullivan Depo. at 38:22–39:4.)

15.     At the Main Jail, visitors and inmates are separated by a physical barrier. (Sullivan Depo. at 39:2–6.)

16.     To allow the inmate and his visitor to see one another, there is a solid glass partition.  (Sullivan Depo. at 39:7–8.)

17.     There is no way to pass items directly between inmates and visitors.  (Sullivan Depo. at 39:9–16.)

18.     Prior to an actual visitation, visitors are searched and patted down.  (Rose White Depo. at 39:18–22.)

///

6

19.    During the time Plaintiff was incarcerated at the jail, items of contraband could be, and were, secreted in the visitors' side of the visitation room and potentially brought to the other side by inmates.  Some inmate workers could also walk the hallways, thereby having access to the contraband left behind.  (Ristine Decl. at 4:10–13.)

20.    Most of the inmates in the main jail were gang members and violent male criminals.  (Ristine Decl. at 4:14–16.)

21.    Notwithstanding the security and glass separating visitors from inmates, experience showed that gang members were required to smuggle drugs, weapons, and other contraband, into the jail.  (Ristine Decl. at 2:24–26.)

22.    Inmates smuggled items into the jail, to use against others or to gain advantage against others.  Weapons could be manufactured in jail from seemingly innocuous items, or parts of other objects.  Contraband was often smuggled into the jails secreted in body parts.  Weapons, drugs, and cell phones have been smuggled into the Merced County jails via anal insertions.  (Ristine Decl. at 2:27–3:3.)

23.    Even in non-contact visitation (the Main Jail) it is still possible to smuggle contraband into the jail.  (Ristine Decl. at 5:4–5.)

24.    Family members smuggled contraband into the jails during visiting hours, including in the diapers of children.  (Ristine Decl. at 3:4–5.)

25.    Smuggled contraband has been left in hidden areas, then to be smuggled to the inmates by other inmates who are used to clean or pass meals.  (Ristine Decl. at 3:5–7.)

26.    Contraband was sometimes found taped under seats of the visiting area, in holes in walls, or in the inside of the telephone handsets, where other inmates could retrieve it after visiting hours.  Notwithstanding searches of the area, contraband still was believed to be transported to prisoners from visiting areas.  (Ristine Decl. at 5:7–10.)

27.    Fires, riots, suicides, escape attempts, outbreaks of diseases, and murders have occurred at both the Main Jail and at John Latoracca.  These events would, of course, put children in danger.  (Ristine Decl. at 2:13–15.)

///

28.     During or about 2007, the correctional staff at the Merced County Jail advised Sheriff Mark Pazin that they were having problems with visitation at both the Main Jail and the John Latoracca Correctional Facility.  (Ristine Decl. at 2:18–20.)

29.     Sheriff Pazin was also aware of gang issues and the overall problems at the jail. Sheriff Pazin was also informed of fights between visitors in the lobby.  (Pazin Decl. at 2:13–14.)

30.     Sheriff Pazin was very concerned about potential injury to visitors, inmates and staff.  Based on his understanding of the facilities and the information he was given, he especially was concerned that young children could be injured by smuggled contraband and/or altercations in visitation areas, or by drive-bys.  He was concerned that they were used to smuggle in contraband, including in diapers.  He did not believe that young children could be adequately protected from inmates, visitors, opposing gangs, or the gangs to which inmates belonged if the inmate was deemed by the gang not to be loyal enough.  These were the realities of the situation. Violence had to be anticipated, and protected against, before people were hurt or killed.  Revenge for minor slights could manifest itself by murder.  (Pazin Decl. at 2:16–24.)

31.     Due to severe staffing problems the presence of young children made the security a more difficult task for the correctional officers.  (Pazin Decl. at 3:2–3.)

32.     Sheriff Pazin considered the needs and safety of the facility and visitors, especially children, and the countervailing interests.  He was also concerned about having intrusive searches on young children that could be necessitated by allowing visitation by young children.  (Pazin Decl. at 2:26–3:2.)

33.     Regarding the safety and security of the institution, not only can disruptive child behavior distract the correctional officers assigned to supervise visitation, but also inmates may rely on those disruptions to facilitate the introduction of contraband.  (Ristine Decl. at 5:1–3.)

34.     Because children can be energetic and unpredictable, they present a special burden for jail staff charged with monitoring, maintaining order, and ensuring visitor safety.  (Ristine Decl. at 4:27–5:1.)

35.     Exposure to violent prisoners carries with it the risk that the safety of children will be jeopardized, as well as the risk that children will be exposed to inappropriate sexual conduct,

by the inmate they are visiting, by other inmates, or by others in the visiting area. Visitors have exposed themselves to inmates, and inmates have exposed themselves to visitors. (Ristine Decl. at 5:18–22.)

36. Sheriff Pazin personally made the decision to modify visitation by minors such that those under the age of twelve could not visit. (Pazin Decl. at 2:25–26; Patterson Decl., Ex. A, pp. 3, 6.)

37. After this policy change, visitation with those under twelve could be conducted in court if ordered by the court or if the court permitted an in-court visit. Inmates also had the ability to talk with family members by telephone. (Ristine Decl. at 2:21–23; ECF No. 76-2, Patterson Decl., Ex. A, pp. 3, 6.)

38. The policy limitation assisted the sheriff in allocating the jail's resources to best protect visitors, inmates, and staff. (Pazin Decl. at 3:4–5.)

39. During the time Plaintiff was incarcerated at the Merced County Jail, special arrangements were sometimes made when a court ordered visitations by minors. (Ristine Decl. at 3:8–10.)

40. These special arrangements were not provided for in the County of Merced's Jail visitation policy. (Patterson Decl., Ex. A, pp. 3, 6.)

41. If there were a special court order, visitation should have been permitted, unless the order were challenged in court. If the jail disagreed with some court order, an officer should have contacted the court or county counsel to oppose such an order in court. (Ristine Decl. at 3:10–13.)

42. A court order would not just be ignored by anyone in authority at the jail. (Ristine Decl. at 3:13–14.)

43. Some five months after Plaintiff was jailed, Plaintiff found out that minors under the age of twelve were not allowed to visit. (Second Amended Complaint ("SAC"), ECF No. 60 at 2:26–28.)

44. While housed in the Main Jail, Plaintiff was denied visitation with his minor children who were under the age of twelve. (James White Depo. at 35:16–20.)

45.     It was explained to Plaintiff that visitation with his minor children was denied because of a policy prohibiting all visitors under the age of twelve.  (James White Depo. at 39:10–13.)

46.     Plaintiff was informed that the reason minors under the age of twelve were not allowed to visit was for the safety and security of the institution and for the safety of the children. (First Amended Complaint, ECF No. 12, ¶ 34.)

47.     Plaintiff received a court order in January 2009 providing that Plaintiff could have visitation with minor children at the jail, unless an emergency situation arises.  (Patterson Decl., Ex. C.)

48.     Plaintiff received another court order in April 2011 providing that he could have visitation with his minor children while in County jail.  (Patterson Decl., Ex. D.)

49.     Plaintiff was never granted permission to have visitation with his children due to the court orders he received.  (James White Depo. at 39:10–13, 54:1–4.)

50.     Plaintiff notified corrections officers of his court orders on several occasions. (James White Depo. at 39:4–42:13.)

51.     Rose White was also told that Plaintiff could not have visits with his minor children even after she explained to the correctional officers that a judge had ordered it was permissible for Plaintiff to have visitation with his children.  (Rose White Depo. at 44:19–45:7.)

52.     Sheriff Pazin does not recall being aware of any visitation orders, other than, perhaps, visitation ordered under supervision.  He does not recall any court orders pertaining to Plaintiff.  (Pazin Decl. at 3:12–14.)

53.     Plaintiff had alternative means of exercising the right he sought to assert.  He could visit with the children when he was in court.  The children were present during Plaintiff's court dates.  (ECF No. 72-5, Knight Depo. at 34:13–35:2.)

54.     During the time he was incarcerated at the Merced County Jail, Plaintiff could have spoken with the children by telephone.  Telephone privileges were afforded to inmates at the jail.  (Ristine Decl. at 4:25–26.)

///

55. During the time he was incarcerated at the Merced County Jail, Plaintiff was able to, and did receive regular visits from his wife and mother, who could have delivered messages to the children. (Knight Depo. at 27:13–25; ECF N. 72-6, Rose White Depo. at 27:1–13.)

56. The regulation was modified in 2011 to permit under twelve-year-old visitation. With regard to the main jail, visitation was otherwise allowed twice a week. Visits were permitted with children if accompanied by an adult. (Ristine Decl. at 3:15–17.)

57. The regulation restricting visitation by minors under the age of twelve was changed during the time Plaintiff was still incarcerated at the Merced County Jail, and Plaintiff was allowed to visit with his children before he was transferred to State prison. (James White Depo. at 53:8–25.)

58. Plaintiff suggests: "COUNTY could have implemented pre-scheduled appointments via telephone for parents bringing a minor-aged child." (SAC at 5:13–14.)

59. Plaintiff's suggested alternative would not deter contraband such as drugs, from being smuggled into the jail, which was a problem during the time Plaintiff was incarcerated there. (Ristine Decl. at 5:11–13.)

60. Plaintiff's suggested alternative would not deter violence at the jail, which was also a problem during the time Plaintiff was incarcerated there. (Ristine Decl. at 5:15–17.)

61. During the time Defendant maintained its policy prohibiting all minors from having non-contact visitation with their parent, Defendant also maintained a policy allowing minors to tour the main jail. (Patterson Decl., Ex. B, pp. 6–7.)

62. Defendant's Facility Tour policy also allowed inmates to address such tours. (Patterson Decl., Ex. B, pp. 6–7.)

63. The Facility Tour policy did not mandate that minors be escorted by a parent or guardian. (Patterson. Decl., Ex. B, pp. 6–7.)

**C.    Parties' Positions**

Defendant argues that even if the restriction on visitation by children under the age of twelve intruded on Plaintiff's constitutional rights, it was a valid regulation because it was reasonably related to the legitimate penological objectives related to the security of the institution

and the safety of children. Plaintiff had alternative means to exercise the asserted right, such as visitation during court dates or communicating with his children by phone or letters. Accommodating the right would have a detrimental effect on the allocation of jail resources, and great deference should be shown to prison officials in the evaluation of whether or not there is a rational basis for penal regulations. Finally, Plaintiff's suggested alternative of pre-scheduling appointments for parents bringing minor children would not deter the smuggling of contraband or violence at the jail, and as such the regulation was not an exaggerated response to those problems.

In opposition, Plaintiff contends that although the visitation policy is legitimate and face-neutral, its application to Plaintiff was not neutral, and more importantly, the policy is not rationally related to the objectives of security and safety at the jail. Plaintiff emphasizes that visits at the main jail were non-contact, and highlights Defendant's policy of allowing minors to tour internal areas at the jail, which was in effect at the same time as the visitation policy at issue. Although alternatives to in-person visits existed, they were not ideal, and therefore this consideration should be considered neutral. Allowing visitations with minor children would have only a negligible impact on staff, inmates, and resources, because Defendant fails to show a "significant ripple effect" on inmates or prison staff as a result of accommodating the constitutional right. Finally, easy and obvious alternatives were available, such as restricting inmate workers' access to the public areas of the jail, more closely monitoring and searching such prisoners while working and exiting the public areas of the visitation rooms, or designating certain visiting days or times for children visitors.

Defendant replies that Plaintiff's opposition fails to provide a single declaration from a lay or expert witness to counter the sworn expert testimony supporting Defendant's legitimate penological interests for its visitation limitation. The visitation policy was rationally related to the legitimate governmental interests of safety and security, and Plaintiff has not disputed that exposure to violent prisoners carries with it the risk that the safety of children will be jeopardized, or that contraband may be smuggled into the jail even where only non-contact visitation is allowed. Defendant's facility tours policy is not comparable to visitation by minors under age twelve, as the tours were more controlled, involved different staff personnel, had extra security

that did not require additional paid correctional staffing, did not involve family and friends of inmates, and did not involve any privacy. Plaintiff has admitted that, although not ideal, alternative means of exercising the asserted right were available. Plaintiff has failed to present any evidence to support the assertion that allowing visitation with minors would have only a negligible impact on jail staff, inmates, and resources. Finally, Plaintiff's suggested remedy of limiting inmate workers from the public areas of the jail demonstrates a fundamental misunderstanding of the real world of jail facilities, where it is common for jails to use inmate workers to maintain upkeep of facilities, and jails are required by state statute to permit inmates to work.

### D.    Analysis

The Supreme Court and the Ninth Circuit have held that incarceration does not terminate a person's rights, whatever they may be, to familial association. Overton v. Bazzetta, 539 U.S. 126, 132 (2003) ("We do not hold, and we do not imply, that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners."); Dunn v. Castro, 621 F.3d 1196, 1205 (9th Cir. 2010) ("[W]e do not hold or imply that incarceration entirely extinguishes the right to receive visits from family members."). Although incarceration necessarily brings with it limitations on a person's rights, particularly those of association, a prisoner nevertheless retains those rights which "are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). In cases such as this in which a visitation policy is being challenged, the Supreme Court and the Ninth Circuit have inquired into whether the regulation is reasonably related to legitimate penological interests under the facts and circumstances of the case. Overton, 539 U.S. at 132 (citing Turner v. Safley, 482 U.S. 78, 89 (1987)); Shakur v. Schriro, 514 F.3d 878, 884 (citing Turner, 482 U.S. at 89).

Under the Supreme Court's decision in Turner, the four factors to be balanced in determining whether a prison regulation is reasonably related to legitimate penological interests are:

///

13

(1) Whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it";

(2) Whether there are "alternative means of exercising the right that remain open to prison inmates";

(3) Whether "accommodation of the asserted constitutional right" will "impact ... guards and other inmates, and on the allocation of prison resources generally"; and

(4) Whether there is an "absence of ready alternatives" versus the "existence of obvious, easy alternatives."

Shakur, 514 F.3d at 884 (quoting Turner, 482 U.S. at 89–90).

### 1.    Rational Connection Between Regulation and Governmental Interest

The parties agree that the visitation policy is facially neutral, and that the security of the institution and the safety of children are legitimate penological objectives. Plaintiff contends, however, that the policy was not applied neutrally because he was not permitted to see his children even after receiving two court orders allowing visitation. Defendant argues that whether the jail complied with an order from a state court is not a federal violation, and in addition, Sheriff Pazin does not recall any court orders pertaining to Plaintiff. Taking the evidence in the light most favorable to Plaintiff, there exists a dispute as to whether any officers at the jail, including Sheriff Pazin, were alerted to the existence of the court orders and then failed to comply with them pursuant to the jail's visitation policy. However, the Court declines to find that this dispute rises to the level of a material issue of fact to be resolved at trial.

Even assuming correctional officers at the jail were aware of and failed to comply with the court orders, this alone does not demonstrate that the continued application of the policy to Plaintiff was unjustified and therefore not rationally connected to the asserted legitimate penological interests in security and safety. It is undisputed that Sheriff Pazin was concerned about potential injury to visitors, inmates, and staff, that young children could be injured by smuggled contraband, altercations in visitation areas, or drive-bys, and that he did not believe that young children could be adequately protected from inmates, visitors, opposing gangs, or gangs to which inmates belonged. (UMF No. 30.) Plaintiff fails to present any evidence, other than

14

conclusory arguments, that Defendant's failure to allow Plaintiff to have visitation with his minor children in compliance with court orders undermined the connection between the visitation policy and Defendant's safety and security concerns.

Plaintiff's remaining arguments concerning whether the policy was rationally related to the stated objectives are similarly unsupported by evidence in the record. Plaintiff has provided no rebuttal to the expert testimony of Lieutenant Ristine as to the legitimate penological concerns that existed at the jail at the time, nor has he provided a rebuttal to the testimony of Sheriff Pazin that the policy was created with such concerns in mind. Rather, Plaintiff argues that the existence of the facility tours program demonstrates that the jail was not truly interested in the safety of minors, because it permitted minors to tour internal areas of the jail and interact with unknown inmates. (UMF Nos. 61, 62.)

In reply, Defendant clarifies that these tours involved probationers and high school and middle school students for a "scared straight" type program. (ECF No. 79-1, Ristine Supp. Decl. at 2:9–12.) The tours were under close supervision by two correctional officers, in addition to a probation officer for probationers and a teacher or administrator for students. (Id. at 2:12–15.) Handpicked sentenced inmates would interact with the teens and vigorously dissuade them from a life of crime. (Id. at 2:16–17.) As the tours were more controlled, involved different staff, had extra security without additional cost to correctional staff, did not involve friends and family of inmates, and did not involve any privacy, the security risks and issues of from this limited program were very different than those presented by visitation of children under twelve. (Id. at 2:18–23.) In light of this supplemental evidence clarifying the differences between the facility tours and concerns with visitation by children under twelve, the existence of this program at the same time as the visitation policy does not raise a genuine dispute of material fact regarding the rational connection between the policy and Defendant's safety and security concerns.

### 2. Alternative Means of Exercising the Right

Plaintiff concedes that alternative means were available to exercise his right to visitation with his young children, including visits in court, telephone calls, and letters. Plaintiff argues that because such alternatives were not ideal, this factor should be considered neutral in the Court's

analysis. However, as Defendant notes, the alternative avenues "need not be ideal . . . they need only be available." Overton, 539 U.S. at 135. The Court considers this factor conceded and finds that such alternative means were available to Plaintiff.

### 3.    Impact of Accommodation of Right on Staff, Inmates, and Resources

Plaintiff asserts only that Defendant has failed to provide any facts showing a "significant ripple effect" on fellow inmates or on prison staff of permitting visitation by children under twelve. However, it is Plaintiff who has failed to provide any to support his conclusory assertion that there would be only a negligible impact on staff, inmates, or resources of accommodating the asserted right. Whether Defendant has asserted a significant, substantial, or other measure of the ripple effect of this accommodation, the only relevant facts before the Court are that staffing was short, making it more difficult to monitor visitation activities with the presence of young children, contraband was smuggled into the jail during visiting hours, including in the diapers of children, and inmates may rely on disruptive child behavior to facilitate the introduction of contraband. (UMF Nos. 6, 24, 31, 33.) Plaintiff has presented no rebuttal evidence that undermines these facts, and it is therefore undisputed that allowing the presence of young children in visiting areas presented a special burden for jail staff charged with monitoring, maintaining order, and ensuring visitor safety. (UMF No. 34.)

### 4.    Absence or Existence of Ready, Obvious, or Easy Alternatives

Plaintiff contends that he has identified several obvious, easy alternatives that would accommodate prisoners' rights at *de minimis* cost. Plaintiff proposes that the jail could limit the access of inmate-workers to public visitation areas, provide more oversight of inmate-workers if access cannot be limited, or designate a particular day or time for children visitors. Again, these assertions are made without any factual support in the record. In reply, Defendant presents evidence that the first proposal is not feasible given the real-world functioning of the jail, particularly in light of the statutory requirement that jails permit inmates to work to maintain upkeep of facilities, and the need to help relieve overworked staff. (Ristine Supp. Decl. at 2:26–28.) Plaintiff has provided no support the conclusion that there is a *de minimis* cost to implement the remaining proposals, nor has he presented facts that to demonstrate that isolation of children

16

visitors to particular days would resolve the concerns that contraband could be smuggled in by way of diapers or child-caused disruption, or that children would otherwise be in danger merely by visiting the jail grounds. In the absence of substantial, or any, evidence in the record that officials exaggerated their response in implementing this policy, the Court defers to the professional expertise of corrections officials. Pell, 417 U.S. at 827.

## IV.    Conclusion and Order

Plaintiff has largely relied on the unsupported assertions of his counsel to rebut the expert testimony properly submitted by Defendant. With respect to the majority of the material facts, Plaintiff has either conceded that they are undisputed or failed to provide evidence to support the existence of a true dispute. At most, Plaintiff has raised a question as to whether Defendant failed to comply with court orders in denying him visitation with his minor children. However, that issue is immaterial to the Court's determination that Defendant's visitation policy was rationally related to the legitimate penological interests in maintaining institutional security and the safety of children. Setting aside unsupported and conclusory arguments, the evidence before the Court, construed in favor of Plaintiff, is insufficient to raise a genuine dispute for trial. The Court therefore concludes that there is no genuine issue of material fact preventing summary judgment in favor of Defendant.

Accordingly, IT IS HEREBY ORDERED as follows:

1. Defendant County of Merced's motion for summary judgment, (ECF No. 72), is GRANTED;

2. Judgment shall be entered in favor of Defendant and against Plaintiff; and

3. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:    **March 29, 2019**            /s/ *Barbara A. McAuliffe*
                                        UNITED STATES MAGISTRATE JUDGE

17